# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **LISA DECLUE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:12CV2330 ACL** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Lisa Declue for Supplemental Security Income under Title XVI of the Social Security Act.   This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.   See 28 U.S.C. § 636(c).   Plaintiff filed a Brief in support of the Complaint.   (Doc. No. 15). Defendant filed a Brief in Support of the Answer.   (Doc. No. 24).

## Procedural History

On February 8, 2010, plaintiff filed an application for Supplemental Security Income, claiming that she became unable to work due to her disabling condition on October 17, 2008.   (Tr. 192-98).   This claim was denied initially and, following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated August 2, 2011.   (Tr. 136-42, 11-25).   Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on November 20,

2012.  (Tr. 1-7).  Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

**A.    ALJ Hearing**

Plaintiff's administrative hearing was held on July 15, 2011.  (Tr. 28-91).  Plaintiff was present and was represented by counsel.  (Tr. 28).  Also present was vocational expert Dr. Jeff McGrosky and medical expert Dr. Morris Alex.  (Id.).

The ALJ examined plaintiff, who testified that she was forty-one years of age, was five-feet, two inches tall and weighed 196 pounds.  (Tr. 32).  Plaintiff stated that her normal weight is 175 pounds, and attributed the weight gain to inactivity.  (Tr. 33).  Plaintiff testified that she was trying to lose weight by dieting.  (Id.).

Plaintiff stated that she lives in an apartment with her fifteen-year-old son and eleven-year-old daughter.  (Tr. 34).  Plaintiff testified that she was divorced and that her children each receive $224 monthly as their share of their father's disability benefits.  (Id.).  Plaintiff stated that she has no other source of income.  (Id.).

Plaintiff testified that she drives short distances.  (Id.).  Plaintiff stated that she starts experiencing muscle spasms if she drives more than approximately ten miles.  (Id.).

Plaintiff testified that she had a twelfth grade education.  (Id.).  Plaintiff stated that she received CNA training and earned a CNA certificate.  (Tr. 36).  Plaintiff testified that she charted and took vital signs as a CNA.  (Id.).

Plaintiff stated that she quit her last position at Potosi Manor, because she was unable to perform the required lifting.  (Tr. 37).  Plaintiff testified that she quit her other positions after her

pregnancies to stay home and care for her children.   (Id.).

Plaintiff's attorney examined plaintiff, who testified that she is unable to work due to lower back pain from degenerative disc disease, which is worse on the left side; her left leg going out; tingling in her arms; a bone spur in her left shoulder; depression; high blood pressure; and migraines.  (Tr. 38-39).   Plaintiff stated that she sees a pain management specialist, Dr. Abdul Naushad, for her lower back pain.   (Tr. 39).   Plaintiff testified that her back pain has been treated with medications, injections, epidural steroid injections, and medial branch blocks.[1]   (Id.). Plaintiff stated that her doctor has recommended an electronic device and a back brace, but her insurance would not pay for these items.   (Id.).   Plaintiff testified that the injections she has received did not provide relief.   (Tr. 40).   Plaintiff stated that she takes Percocet[2] and Oxycodone[3] for pain.   (Id.).

Plaintiff testified that her left leg goes out and causes her to fall, because a nerve in her lower back is compressed.   (Tr. 41).   Plaintiff stated that this occurred approximately six to eight times the prior year.   (Id.).

Plaintiff testified that she has been using a cane for one-and-a-half to two years.   (Id.). Plaintiff stated that her pain management doctor prescribed the cane.   (Tr. 42).

Plaintiff testified that she experiences tingling in her left leg and her arms.   (Id.).   Plaintiff stated that the tingling sensation in her arms is just an annoyance, whereas the tingling in her leg

---

[1]Medial branch nerves are small nerves in the facet joints in the spine.   A medial branch block temporarily interrupts the pain signal being carried by the medial branch nerves that supply a specific facet joint.   Stedman's Medical Dictionary, 258 (28th Ed. 2006).

[2]Percocet is indicated for the relief of moderate to moderately severe pain.   Physician's Desk Reference (PDR), 1127 (63rd Ed. 2009).

[3]Oxycodone is indicated for the management of moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time.   See PDR at 2590.

becomes very painful.   (Tr. 43).

Plaintiff testified that her depression has worsened due to her inability to perform activities.   (Tr. 44).   Plaintiff testified that her crying spells have increased in the past year from one every two to four months to three spells a week.   (Tr. 45-46).   Plaintiff stated that she does not have any suicidal or homicidal thoughts.   (Tr. 46).   Plaintiff testified that she bathes, but she typically does not get dressed if she is not leaving the house.   (Tr. 47).   Plaintiff stated that her primary care physician is treating her depression.   (Id.).

Plaintiff stated that she only eats about once a day, because her medication has caused her appetite to decrease.   (Id.).   Plaintiff testified that her medications cause the additional side effects of drowsiness, dizziness, and nervousness.   (Tr. 48).

Plaintiff testified that she lies down during the day due to drowsiness.   (Id.).   Plaintiff stated that she sleeps for one to two hours in the afternoon after taking her medication.   (Id.).   Plaintiff testified that she does not sleep well at night due to pain.   (Tr. 49).   Plaintiff stated that she typically gets a total of about four hours of sleep a night.   (Id.).

Plaintiff testified that she also has severe migraines.   (Tr. 50).   Plaintiff stated that she takes medication daily for her migraines.   (Id.).   Plaintiff testified that she had experienced four to six migraines in the preceding four-month period.   (Id.).   Plaintiff stated that she sought emergency room care for a migraine on one occasion.   (Id.).   Plaintiff testified that, when she experiences a migraine, she cannot tolerate light or sound, she vomits, and feels like her head is pulsating.   (Id.).   Plaintiff stated that an average migraine lasts two to three days.   (Tr. 51).

Plaintiff testified that she drives short distances approximately twice a week.   (Tr. 52).   Plaintiff stated that she drives to the grocery store to get a few items and spends about ten minutes in the store.   (Id.).   Plaintiff testified that she is able to lift a gallon of milk, but is unable to lift a

4

case of water due to pain in her back and legs and numbness in her hands. (Tr. 53). Plaintiff stated that she is able to walk fifty to seventy-five feet without stopping. (Tr. 54). Plaintiff testified that she is able to stand for five minutes before she has to sit down and rest for five minutes due to lower back pain. (Tr. 55). Plaintiff stated that she experiences numbness and shooting pain down her left leg after sitting more than approximately ten minutes. (Tr. 56). Plaintiff testified that she sits outside and watches her children play for ten to fifteen minutes. (Tr. 57). Plaintiff stated that she stopped attending church in November of 2010, because she was unable to sit through the two-hour service due to back pain. (Id.).

Plaintiff testified that she is able to perform household chores such as mopping with a small gliding mop, making her bed, cleaning bathrooms other than the tubs, and cooking. (Tr. 58). Plaintiff stated that her son helps her cook by checking on the food when she sits down to take breaks. (Tr. 59). Plaintiff testified that she starts the laundry and her children get it out and put it into the dryer. (Tr. 60).

Plaintiff stated that she enjoys reading books as a hobby, and that she reads approximately two books a week. (Tr. 61).

The ALJ inquired of plaintiff, who testified that her pain level during the hearing was an eight on a scale of one to ten. (Tr. 62). Plaintiff stated that she had not taken any pain medication since 2:00 a.m., because she wanted to be alert for the hearing. (Tr. 63). Plaintiff testified that medication brings her pain level to a six, but most of the time her pain level is a seven to eight. (Id.). Plaintiff stated she was unable to work as a CNA at a nursing home when her pain level was at a six, because she had to lift patients weighing one hundred pounds or more. (Tr. 64).

Plaintiff testified that she typically lies down for a total of one-hour-and-forty-five minutes in a day due to pain. (Tr. 65). Plaintiff stated that she tries to get up and do as much as she can

throughout the day. (Tr. 66). Plaintiff testified that she is able to perform household chores for about twenty minutes at a time before she has to take a ten-minute break. (Id.). Plaintiff stated that she spends a total of a "couple of hours" a day doing household chores. (Tr. 67).

Plaintiff testified that she has participated in physical therapy, which did not help. (Id.). Plaintiff stated that her doctor has discussed implanting an electronic device in her back to help with pain, but her insurance will not cover it. (Tr. 68). Plaintiff testified that her doctor advised her to wait as long as possible before undergoing surgery due to the risks involved. (Id.).

Plaintiff stated that her migraines have worsened over the past three months. (Tr. 69). Plaintiff testified that in the prior six-month period, she would have missed approximately three to four days of work due to migraines had she been working. (Tr. 71).

Plaintiff stated that she would be unable to work at a position where she would not be required to do heavy lifting and she could sit and stand at will for eight hours a day. (Tr. 72).

Plaintiff testified that she occasionally falls asleep when she sits in her recliner after taking her medication, because it makes her drowsy. (Tr. 73).

The ALJ next examined medical expert, Dr. Alex, who noted that plaintiff's nerve conduction study results were not in the record and suggested that plaintiff's attorney submit these records. (Tr. 74). Plaintiff stated that her doctor told her that her left side was more severe than the right side in her legs. (Id.). Dr. Alex also noted that plaintiff had recently undergone MRIs and those records were not in the file. (Tr. 75). Plaintiff testified that her recent MRI revealed degenerative disc disease and narrowing of the spinal canal. (Id.). Dr. Alex stated that this information was "crucial," as there were no objective findings in the record to support plaintiff's subjective complaints. (Id.).

Dr. Alex testified that, based on a review of the evidence in the record, plaintiff had the

following diagnoses:  obesity, increased blood pressure, and diffuse facet disease.  (Tr. 77-78).

Dr. Alex stated that there was a "great deal of conflict between the objective findings and the

subjective complaints."  (Tr. 78).  Dr. Alex testified that the objective findings support the

opinion of the state agency clerk that plaintiff was capable of light lifting and carrying.  (Tr. 79).

Dr. Alex stated that plaintiff "urgently needs…mental health care, and she needs cognitive

behavioral therapy."  (Id.).  Dr. Alex testified that there was no EMG evidence in the record of

carpal tunnel syndrome.  (Id.).  Dr. Alex stated that plaintiff should also undergo a "neuropsych

evaluation with an MMPI."[4]  (Tr. 81).

 Dr. Alex testified that there was a record of migraine headache diagnoses.  (Tr. 83).  Dr.

Alex stated that there was no objective testing available to confirm migraines.  (Tr. 84).  Dr. Alex

testified that plaintiff's testimony regarding drowsiness was supported by her medications list.

(Id.).

 Plaintiff's attorney indicated that he would try to obtain the records of plaintiff's EMG

nerve conduction studies and MRIs.  (Id.).  The ALJ stated that he would leave the record open

for thirty days so that plaintiff could obtain these records.  (Id.).

 The ALJ examined vocational expert Dr. McGrowsky, who testified that plaintiff's past

work was classified as cashier, which is either medium or light and unskilled; and certified nurse's

aide, which is medium to heavy and semi-skilled.  (Tr. 82).

 The ALJ asked Dr. McGrowsky to assume a hypothetical claimant with plaintiff's

background and the following limitations:  light lifting and carrying twenty pounds occasionally,

and ten pounds frequently; sit, stand, and walk about six hours in an eight-hour workday;

---

[4]The Minnesota Multiphasic Personality Inventory or "MMPI" is a psychological test.  See
Stedman's at 996.

occasional climbing, balancing, stooping, kneeling, crouching and crawling; never climb ladders, ropes, or scaffolds; never engage in work requiring balancing critical to the performance of her duties; never walk on a balance beam without support; limited in reaching in all directions, including overhead; avoid concentrated exposure to extreme cold, high levels of humidity, violent vibration of the body; and avoid concentrated exposure to respiratory irritants or high concentration of fumes, odors, dust, gases, and poor ventilation that might aggravate migraine headaches.   (Tr. 82-83).   Dr. McGrowsky testified that such an individual would be unable to perform plaintiff's past work.   (Tr. 85).   Dr. McGrowsky stated that the individual could perform other, light jobs, such as office helper (200,000 positions nationally, 4,000 in Missouri); contribution solicitor (150,000 positions nationally, 3,000 in Missouri); and child care attendant (100,000 positions nationally, 2,000 in Missouri).   (Id.).

The ALJ next asked Dr. McGrowsky to assume that the individual requires a job that would keep her on her feet for at least six hours out of the day due to drowsiness caused by medication.   (Tr. 86).   Dr. McGrowsky testified that the jobs he mentioned would still be available, as there is standing involved and the individual can alternate between sitting and standing to some extent.   (Id.).

The ALJ then asked Dr. McGrowsky to assume the following additional limitations: simple, routine, repetitive, unskilled work; and work that does not require interaction with others as critical to the duties.   (Tr. 86-87).   Dr. McGrowsky testified that the individual would be unable to perform the contributions solicitor position or the children's attendant position.   (Tr. 87).   Dr. McGrowsky stated that the individual could still perform the office helper position and other positions, such as dining room attendant (200,000 positions nationally, 5,000 in Missouri); and light stocking (100,000 positions nationally, 2,000 in Missouri).   (Id.).

Dr. McGrowsky testified that plaintiff would be unable to perform any work if her testimony is found fully credible and she required frequent breaks due to pain. (Tr. 88).

The ALJ then stipulated that if the plaintiff was limited in the manner described in Dr. Andrew Ninichuck's report, she would be unable to sustain any full-time work. (Tr. 90).

**B.**     <u>**Relevant Medical Records**</u>

Plaintiff underwent an MRI of the lumbosacral spine on August 29, 2006, which revealed diffuse facet arthropathy,[5] with no significant disc bulge, herniations, or stenosis. (Tr. 272).

Plaintiff presented to J. Paul Tindall, D.O. on December 19, 2006, at which time plaintiff complained of chronic back pain and numbness in her legs. (Tr. 268). Dr. Tindall's assessment was lumbar disc herniation. (<u>Id.</u>). He recommended that plaintiff see a neurologist. (<u>Id.</u>).

Plaintiff saw Dr. Tindall on January 29, 2007, at which time plaintiff complained of low back pain, pain shooting down her legs, muscle spasms, and occasional numbness in her legs. (Tr. 267). Dr. Tindall's assessment was lumbar disc herniation. (<u>Id.</u>). He indicated that plaintiff was scheduled to see a neurosurgeon the following week. (<u>Id.</u>).

Plaintiff saw Dr. Tindall on April 20, 2007, at which time she complained of pain shooting down her legs. (Tr. 269). Dr. Tindall refilled plaintiff's Percocet and Soma[6] and referred her to a neurosurgeon for an evaluation. (<u>Id.</u>).

Plaintiff presented to Advanced Pain Center on June 27, 2008, for follow-up regarding hypertension and depression. (Tr. 307). Plaintiff was diagnosed with hypertension, degenerative disc disease, and depression. (<u>Id.</u>).

---

[5]Any disease affecting a joint. <u>Stedman's</u> at 161.
[6]Soma is indicated for the relief of discomfort associated with acute, painful musculoskeletal conditions. <u>See</u> <u>PDR</u> at 1931.

Plaintiff underwent a lumbar medial branch block at Advanced Pain Center on October 1, 2008.  (Tr. 304).

Plaintiff presented to Advanced Pain Center on October 6, 2008, at which time she complained of neuropathy on the bottoms of both feet and muscle spasms.  (Tr. 299).  Plaintiff indicated that the medial branch block injection she received the prior week left her feeling weak.  (Id.).  Plaintiff was diagnosed with lumbar discogenic pain, lumbar facet arthropathy, muscle spasm, and myofascial pain.  (Tr. 301).  Plaintiff was continued on Gabapentin[7] and Oxycodone. (Id.).  It was recommended that plaintiff limit lifting to fifteen to twenty pounds, with no squatting, kneeling, climbing or twisting activities.  (Id.).

On October 15, 2008, plaintiff underwent a steroid injection and a lumbar medial branch block.  (Tr. 296).

Plaintiff presented to Advanced Pain Center on November 3, 2008, at which time she reported that the last injection helped her, although she complained of dizziness and fatigue and numbness and tingling in the legs.  (Tr. 291).  Upon examination, plaintiff's gait was well-coordinated, but tenderness of the lumbar spine was noted.  (Tr. 292).  Plaintiff's medications were continued.  (Id.).

Plaintiff saw Dr. Xiaohui Fan, M.D., at Advanced Pain Center on December 1, 2008, at which time she complained of chronic weakness in the left leg, which had been worse recently and resulted in some falls.  (Tr. 287).  Upon examination, Dr. Fan noted tenderness of the lumbar spine.  (Tr. 288).  Dr. Fan continued plaintiff's medications and recommended that plaintiff undergo another medial branch block on the left side.  (Tr. 290).  He also

---

[7]Gabapentin is indicated for the treatment of nerve pain.  See WebMD, http://www.webmd.com/drugs (last visited April 14, 2014).

recommended a neurology consult for left leg weakness.    (Id.).

Dr. Fan performed a lumbar medial branch block on December 10, 2008.    (Tr. 284).

Plaintiff presented to Dr. Fan on December 19, 2008, at which time plaintiff reported that her pain was going down to her thighs at times and that the left medial branch block did not help. (Tr. 280).    Dr. Fan diagnosed plaintiff with lumbar discogenic pain, lumbar facet arthropathy, muscle spasms, and myofascial pain.    (Tr. 282).    Dr. Fan continued plaintiff's Oxycodone and added medication to help with sleep.    (Id.).

Plaintiff presented to Dr. Fan on January 19, 2009, at which time she rated her lower back pain as a six.    (Tr. 277).    Dr. Fan continued plaintiff's medications.    (Tr. 279).

Plaintiff presented to Kasey L. Schmitt, PA-C, at Jefferson County Orthopaedic Surgery and Sports Medicine on May 29, 2009, with complaints of right hand and left shoulder pain, and numbness and tingling in the right hand.    Upon examination, plaintiff had full active range of motion of the right hand with good strength and stability, and positive carpal tunnel tests. Examination of the left shoulder revealed full active range of motion, pain with internal rotation, and good strength and stability in all directions.    Plaintiff exhibited a positive impingement test. (Tr. 328).    Ms. Schmitt diagnosed plaintiff with right hand numbness and tingling with probable carpal tunnel syndrome; and left shoulder impingement syndrome with sprain.    Ms. Schmitt recommended a wrist brace and home exercise program, and advised plaintiff to ice and elevate frequently.    It was noted that plaintiff could not participate in physical therapy secondary to it not being covered by her insurance.    (Tr. 329).

Plaintiff presented to Andrew Ninichuck, M.D. on July 6, 2009, with complaints of upset stomach and sinus pressure.    (Tr. 316).    Plaintiff was diagnosed with hypertension (stable), chronic lower back pain (stable), insomnia (stable), anxiety/depression (stable), dyslipidemia

(stable), and a bone spur of the left ankle.    (Id.).

Plaintiff presented to Dr. Fan on January 12, 2010, for follow-up regarding pain in the low back and left leg.    (Tr. 432).    Upon examination, plaintiff had a well-coordinated gait, tenderness of the lumbar spine, and restricted flexion and extension of the lumbar spine.    (Tr. 433).    Dr. Fan diagnosed plaintiff with lumbar discogenic pain, lumbar facet arthropathy, muscle spasms, and myofascial pain.    (Tr. 434).    Dr. Fan discontinued the Oxycodone, prescribed Percocet, and continued the Gabapentin.    (Id.).

Plaintiff saw Dr. Fan on February 16, 2010 for follow-up.    (Tr. 429).    Dr. Fan noted tenderness of the lumbar spine with restricted flexion and extension, but normal muscle strength and sensation, and no signs of nerve or spinal cord tension.    (Tr. 430).    Dr. Fan diagnosed plaintiff with lumbar discogenic pain, lumbar facet arthropathy, muscle spasms, and myofascial pain.    (Tr. 431).    Plaintiff's medications were continued.    (Id.).

Plaintiff saw Krishnappa A. Prasad, M.D. at Advanced Pain Center on April 12, 2010, at which time she complained of lower back pain that was radiating down the anterior portion of the left thigh to the knee.    (Tr. 423).    Upon examination, plaintiff's gait had an antalgic trace, and tenderness in the lumbar spine was noted.    (Tr. 424).    Plaintiff's medications were continued.    (Id.).

Plaintiff saw Dr. Ninichuck for follow-up on May 4, 2010, at which time she complained of a growth on her upper leg and worsening depression.    (Tr. 362).

Plaintiff saw Bobby Enkvetchakul, M.D. at Missouri Occupational Medicine on May 11, 2010, for a consultative evaluation.    (Tr. 332-35).    Plaintiff complained of pain in her left shoulder and low back.    Plaintiff presented with a cane, but she did not use it during the exam or in the exam room.    Plaintiff ambulated with a slight limp, but this was not fully consistent, as

she did not use it during the exam and held it in her left hand. (Tr. 332). Plaintiff's active range of motion of the lumbar spine was very limited, and she complained of pain over the lumbar spine region. Palpation of the lumbar spine revealed diffuse tenderness over the lumbar region. Waddell's testing[8] was positive for pain with light touch, simulated rotation, and shoulder motion. Plaintiff's strength was normal although there did appear to be some pain inhibition on testing. Plaintiff demonstrated limited range of motion in both of her shoulders bilaterally. Although plaintiff reported just left shoulder complaints during the interview, she complained of pain over both shoulders during the examination process. Plaintiff essentially stated that she had pain complaints over her entire body. Examination of the wrists revealed healed carpal tunnel release scars bilaterally. The Beck depression inventory was administered and revealed scores consistent with a moderate depression level. Dr. Enkvetchakul diagnosed plaintiff with low back pain, subjective by history; left shoulder and essentially whole body pain complaints; evidence of bilateral carpal tunnel release surgeries; and depression. Dr. Enkvetchakul stated that plaintiff's complaints of low back pain are primarily subjective and her physical examination is not indicative of any type of specific pathology in the lumbar spine region. He stated that plaintiff showed "multiple signs of symptom magnification." (Tr. 333). Dr. Enkvetchakul stated that depression can have an impact on how plaintiff perceives and deals with her pain complaints, and that he suspects depression is probably a significant factor in her present condition. Dr. Enkvetchakul stated that there was no specific objective evidence of pathology that would require any type of work limitations. Dr. Enkvetchakul expressed the

---

[8] "Waddell signs are a group of 8 physical findings, . . . the presence of which has been alleged at times to indicate the presence of secondary gain and malingering." Fishbain, DA, et al., Is there a relationship between nonorganic physical findings (Waddell signs) and secondary gain/malingering?, http://www.ncbi.nlm.nih.gov/pubmed/15502683 (last visited April 14, 2014).

opinion that plaintiff was capable of sitting during a normal eight-hour workday given the usual breaks, and had no restrictions in standing, walking, carrying, or reaching. He stated that plaintiff should avoid any safety sensitive type duties while taking medications. (Tr. 334).

Plaintiff presented to Dr. Abdul Naushad at Advanced Pain Center for follow-up on May 18, 2010. (Tr. 419). Upon examination, Dr. Naushad noted an antalgic trace to plaintiff's gait, tenderness of the lumbar spine, and muscle spasm. (Tr. 420). Dr. Naushad adjusted plaintiff's medications. (Tr. 420-21).

Plaintiff underwent a lumbar epidural steroid injection on June 1, 2010. (Tr. 417).

State agency psychologist Marsha Toll, Psy.D. completed a Psychiatric Review Technique on June 2, 2010, in which she expressed the opinion that plaintiff's depression was not severe. (Tr. 336).

Plaintiff saw Dr. Naushaud for follow-up on June 21, 2010, at which time she reported that the steroid injection helped for about one-and-a-half weeks. (Tr. 412). Dr. Naushad continued plaintiff's medications. (Tr. 413).

Plaintiff underwent a lumbar epidural steroid injection on July 6, 2010. (Tr. 410).

Plaintiff continued to present for pain management follow-up approximately monthly at Advanced Pain Center. On July 26, 2010, it was noted that plaintiff walked with a cane. (Tr. 405). Plaintiff's medications were continued. (Tr. 406). On September 14, 2010, plaintiff's medications were continued and she was advised to continue with heat treatment and her home exercise program. (Tr. 402). Plaintiff underwent an epidural steroid injection on October 5, 2010. (Tr. 398). Plaintiff's medications were continued on November 9, 2010. (Tr. 393).

On January 18, 2011, plaintiff was diagnosed with lumbosacral spondylosis,[9] thoracic or lumbosacral neuritis or radiculitis,[10] brachia neuritis[11] or radiculitis NOS, and pain in the left shoulder joint. Her medications were continued. (Tr. 389). On February 15, 2011, Dr. Naushad noted tenderness of the lumbosacral spine, muscle spasm, and positive straight leg raising on the left. Dr. Naushad diagnosed plaintiff with lumbosacral spondylosis without myelopathy, thoracic or lumbosacral neuritis or radiculitis, brachia neuritis or radiculitis NOS, and localized osteoarthrosis[12] of the lower leg. (Tr. 385). On March 22, 2011, plaintiff reported that she had presented to the emergency room the prior weekend due to a severe headache. (Tr. 380). Upon examination, Dr. Naushad noted tenderness of the cervical and lumbosacral spine, muscle spasm, and positive straight leg raising on the right side. (Tr. 380-81).

Dr. Ninichuck completed a Physical Residual Functional Capacity Questionnaire on March 25, 2011, in which he indicated that he had been treating plaintiff every six months since September 2008 for hypertension and symptoms of depression, low back pain, migraines, fatigue, joint and muscle pain, anxiety, and insomnia. Dr. Ninichuck stated that plaintiff ambulates with a cane and has to go to the emergency room for migraines. (Tr. 364). Dr. Ninichuck indicated that plaintiff was incapable of even "low stress" jobs. (Tr. 365). Dr. Ninichuck expressed the opinion that plaintiff had the following limitations: able to walk fifty

---

[9]Ankylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature. Stedman's at 1813.

[10]Disorder of the spinal nerve roots. Stedman's at 1622.

[11] A neurologic disorder characterized by the sudden onset of severe pain, usually about the shoulder and often beginning at night, soon followed by weakness and wasting of various forequarter muscles. Stedman's at 70.

[12]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1388.

feet; sit for fifteen minutes at a time and sit a total of less than two hours; stand for ten minutes at a time and stand a total of less than two hours; must use a cane when engaging in occasional standing/walking; can never lift or carry even less than ten pounds; can occasionally turn head right or left and hold head in a static position; can rarely look up or down; can rarely stoop; can never twist, crouch, or climb; and has significant limitations with reaching, handling or fingering.   (Tr. 365-67).   Dr. Ninichuck stated that plaintiff takes Pristiq and Valium for anxiety; Atenolol for hypertension; and Ambien for insomnia.   Dr. Ninichuck stated that plaintiff's migraines are poorly controlled with medications.   Dr. Ninichuck indicated that plaintiff also has swelling in her lower legs, for which she takes medication.    (Tr. 368).

Plaintiff saw Dr. Naushad for follow-up on April 19, 2011, at which time Dr. Naushad noted tenderness of the cervical and lumbosacral spine.   Dr. Naushad continued plaintiff's medications.   (Tr. 378).   On May 24, 2011, Dr. Naushad noted tenderness of the cervical and lumbosacral spine and muscle spasm of the lumbar spine, and continued plaintiff's medications. (Tr. 374).

Plaintiff presented to Advanced Pain Center for follow-up on June 21, 2011, at which time tenderness of the cervical and lumbosacral spine was noted.    (Tr. 370).

**Evidence Submitted to the Appeals Council**

Plaintiff underwent an MRI of the lumbar spine on June 9, 2011, which revealed diffuse facet arthropathy, worse at L4-6, particularly on the left side where there is some foraminal narrowing and mild canal narrowing as well.    (Tr. 460).

Plaintiff presented to Bonne Terre Health Center on July 19, 2011, with complaints of low back and left shoulder pain.   (Tr. 439).   Upon examination, tenderness was noted in the cervical and lumbosacral spine.   Plaintiff was assessed with lumbosacral spondylosis without

myelopathy, thoracic or lumbosacral neuritis or radiculitis, and localized osteoarthrosis of the lower leg. Her medications were continued. (Tr. 443). Plaintiff's medications were continued on August 24, 2011. (Tr. 440).

Plaintiff presented to Advanced Pain Center for follow-up on October 5, 2011, at which time she reported increased left back/leg pain, with numbness in the left leg. (Tr. 472). Upon examination, plaintiff had a mild antalgic gait, walked with a cane, and tenderness was noted in the lumbar spine. Plaintiff's medications were continued. (Tr. 473). On November 9, 2011, and December 7, 2011, tenderness of the cervical and lumbosacral spine was noted. Plaintiff's medications were continued. (Tr. 469, 466).

Plaintiff presented to Resolutions Behavioral Healthcare on January 3, 2012. Plaintiff reported that her anxiety is mostly controlled, but she was stressed out due to medical issues. Upon examination, plaintiff was appropriate, cooperative, and coherent with a euthymic mood. Plaintiff was diagnosed with major depressive disorder with a GAF score[13] of 57.[14] (Tr. 492).

Plaintiff presented to Advanced Pain Center for follow-up on January 18, 2012, at which time her medication regimen was continued. (Tr. 463-64).

Plaintiff presented to Resolutions Behavioral Healthcare on March 5, 2012, at which time she reported experiencing depression the prior few weeks. Plaintiff was diagnosed with major depressive disorder, with a GAF score of 55. (Tr. 491). On May 4, 2012, plaintiff was

---

[13]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[14]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

described as depressed and irritable on examination.   (Tr. 490).   On June 29, 2012, plaintiff's mood was euthymic.   (Tr. 489).   On July 24, 2012, plaintiff reported feeling "edgy," and recounted emotional abuse by her ex-husband.   Plaintiff cried throughout her session.   Plaintiff was diagnosed with major depressive disorder with a GAF score of 45.[15]   It was recommended that plaintiff increase her coping skills, manage her anger, and explore her past abuse.   (Tr. 488).   On July 30, 2012, plaintiff continued to tell her story regarding past abuse and cried throughout the session.   Plaintiff was diagnosed with major depressive disorder, rule out PTSD, and was assessed a GAF score of 45.   (Tr. 487).

Dr. Fan completed a Physical Residual Functional Capacity Questionnaire on August 22, 2012, in which he indicated that he saw plaintiff monthly since 2008 for lumbar and cervical degenerative disc disease with symptoms of neck pain to the left arm and low back pain to the left leg.   Objective signs noted were antalgic gait and tenderness and decreased range of motion of the cervical and lumbar spine.   (Tr. 494).   Dr. Fan indicated that plaintiff's pain interfered with her attention and concentration frequently and she was incapable of even "low stress" jobs. (Tr. 495).   Dr. Fan expressed the opinion that plaintiff had the following limitations:   able to walk less than one block; sit for fifteen minutes at a time and sit a total of four hours; stand for ten minutes at a time and stand a total of less than two hours; requires periods of walking around during an eight-hour workday; must shift positions at will from sitting, standing and walking; requires unscheduled breaks every fifteen minutes; can lift and carry less than ten pounds occasionally; can occasionally look down, turn head, look up, and hold head in a static position; can rarely twist, stoop, and climb; and can never crouch or squat.   (Tr. 496-97).   Finally, Dr.

---

[15]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."   DSM-IV at 32.

Fan found that plaintiff was likely to be absent from work as a result of her impairments more than four days per month. (Tr. 497).

Plaintiff presented to Resolutions Behavioral Health on August 7, 2012, at which time she discussed the death of her thirty-year-old nephew. Plaintiff cried throughout the session. Plaintiff was diagnosed with major depressive disorder and rule out PTSD, with a GAF score of 45. (Tr. 486). On August 14, 2012, plaintiff expressed anger towards the people responsible for her nephew's death. Plaintiff reported crying spells and depression regarding her physical limitations. Plaintiff was diagnosed with major depressive disorder, rule out PTSD, and was assessed a GAF score of 50. (Tr. 485).

## The ALJ's Determination

The ALJ made the following findings:

1.  The claimant has not engaged in substantial gainful activity since January 28, 2010, the application date (20 CFR 416.971 *et seq*.).

2.  The claimant has the following severe impairments: Disorders of the spine, left shoulder impingement syndrome, hypertension and obesity (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 416.967(b).

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on December 8, 1969 and was 40 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since January 28, 2010, the date the application was filed (20 CFR 416.920(g)).

(Tr. 16-21).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income protectively filed on January 28, 2010, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 22).

## Discussion

### A. Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.   See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).   "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."   Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).   The analysis required has been described as a "searching inquiry."   Id.

**B.      Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a).   The claimant has the burden of proving that s/he has a disabling impairment.   See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.   See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).   First, it is determined whether the claimant is currently engaged in "substantial gainful employment."   If the claimant is, disability benefits must be denied.   See 20 C.F.R. §§ 404.1520, 416.920 (b).   Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.   See 20 C.F.R §§ 404.1520 (c), 416.920 (c).   To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."   Id.   Age, education and work experience of a claimant are not considered in making the "severity" determination.   See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.   See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).   This listing is found in Appendix One to 20 C.F.R. 404.   20 C.F.R. pt. 404, subpt. P, App. 1.   If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.   See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).   If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.   See 20 C.F.R. § 404.1520 (e), 416.920 (e).   If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.   See id.   If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).   The claimant is entitled to disability benefits only if s/he is not able to perform any other work.   See id.   Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.   See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.   The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.   See 20 C.F.R. §§ 404.1520a (b) (1),

416.920a (b) (1).   If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).   The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work:   activities of daily living, social functioning, concentration, and persistence or pace.   See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).   Functional loss is rated on a scale that ranges from no limitation to a level of severity, which is incompatible with the ability to perform work-related activities.   See id.   Next, the Commissioner must determine the severity of the impairment based on those ratings.   See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).   If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.   See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).   This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.   See id.   If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.   See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.      Plaintiff's Claims

Plaintiff first argues that the ALJ erred in determining plaintiff's RFC.   Plaintiff next contends that the hypothetical question posed to the vocational expert was erroneous.   The undersigned will discuss plaintiff's claims in turn.

The ALJ made the following determination with regard to plaintiff's RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in

20 CFR 416.967(b).

(Tr. 19).

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations.   Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.   Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).   Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional.   See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record).   An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record.   See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

In determining plaintiff's RFC, the ALJ discussed the medical opinion evidence.   The ALJ noted that medical expert Dr. Morris Alex expressed the opinion that plaintiff was limited to light exertional work.   (Tr. 20).   The ALJ stated that he found Dr. Alex "to be fully qualified and his testimony credible."   (Id.).

The ALJ indicated that he was assigning "minimal weight" to the opinion of treating source Dr. Ninichuck.   (Id.).   The ALJ stated that Dr. Ninichuck's opinions were "incongruous with the generally unremarkable nature of longitudinal findings" and premised largely upon plaintiff's subjective complaints.   (Id.).

Plaintiff argues that the ALJ erred in relying on the opinion of the non-examining medical

expert and rejecting the opinion of plaintiff's treating physician.   Plaintiff contends that the RFC formulated by the ALJ is not supported by the medical evidence.   The undersigned agrees.

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians.   Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001).   The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole.   Id.   "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'"   Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)).   However, "[w]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight."   Halverson v. Astrue, 600 F.3d 922, 929-30 (8th Cir. 2010) (internal quotation marks omitted).   The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight.   Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).   The opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(1).   Under the regulations, the ALJ "will always give good reasons . . . for the weight [he or she] give[s] [a claimant's] treating source opinion."   20 C.F.R. § 404.1527(c)(2).

As previously noted, the ALJ indicated that he was assigning significant weight to the opinion of non-examining medical expert Dr. Alex, who testified at the administrative hearing. At the beginning of his testimony, Dr. Alex noted that plaintiff had recently undergone an MRI, which was not in the file.   (Tr. 75).   Dr. Alex also noted that records of plaintiff's EMG testing were not in the file.   (Id.).   Plaintiff testified that her recent MRI revealed narrowing of the

spinal canal.   (Id.).   Dr. Alex stated:   "This information's crucial, because of subjective complaints, and the records—it's not show[ing] objective findings."   (Id.).   Dr. Alex stated "it would be important" to obtain these records.   (Tr. 76).   Based on the objective evidence in the file at the time of the hearing, Dr. Alex expressed the opinion that plaintiff was capable of performing light work.   (Tr. 79).   When asked by the ALJ whether there were any other studies that should be obtained, Dr. Alex stated that plaintiff "probably ought to have a neuropysch evaluation with an MMPI."   (Tr. 80-81).

Plaintiff submitted additional medical evidence to the Appeals Council.   (Tr. 5-6).   The Appeals Council indicated that it had considered the additional evidence and found that it did not provide a basis for changing the ALJ's decision.   (Tr. 1-2).   The Appeals Council specifically noted evidence from Bonne Terre Health Center, Resolutions Behavioral Health, Dr. Fan and Select Pain & Spine Center dated after October 2011.   (Tr. 2).   The Appeals Council stated that this evidence does not affect the ALJ's decision regarding whether plaintiff was disabled beginning on or before August 2, 2011.   (Id.).

 "An application for disability benefits remains in effect only until the issuance of a 'hearing decision' on that application."   Myers v. Colvin, 721 F.3d 521, 526 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.620(a), 416.330).   New evidence submitted to the Appeals Council is considered only to the extent it "relates to the period on or before the date of the [ALJ's] hearing decision."   20 C.F.R. §§ 404.970(b), 416.1470(b).   When that decision is challenged in a § 405(g) action, the Court determines whether it is "supported by substantial evidence on the record as a whole, including the new evidence."   Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007).   "'To be new, evidence must be more than merely cumulative of other evidence in the record.'"   Perks v. Astrue, 687 F.3d 1086, 1093 (8th Cir. 2012) (quoting Bergmann v. Apfel, 207

F.3d 1065, 1069 (8th Cir. 2000)).

The Appeals Council properly pointed out that the majority of the evidence submitted by plaintiff relates to a period after the hearing decision and is therefore not relevant to plaintiff's current application. Plaintiff also included records from an MRI of the lumbar spine she underwent on June 9, 2011. (Tr. 460). The MRI revealed diffuse facet arthropathy, which was worse at L4-6, particularly on the left side where there was some foraminal narrowing and mild canal narrowing as well. (Id.). The Appeals Council did not specifically address this evidence, although it was included within records from Advanced Pain Center, which were cited by the Appeals Council.

The June 2011 MRI was relevant to the instant application as the ALJ issued his decision on August 2, 2011. Plaintiff testified at the hearing that this MRI revealed narrowing of the spinal canal, and Dr. Alex stated that this information was "crucial," as there were no such objective findings in the record to support plaintiff's subjective complaints. (Tr. 75). The records submitted to the Appeals Council confirm plaintiff's testimony that the MRI revealed narrowing of the spinal canal. Dr. Alex clearly stated that his opinion that plaintiff was capable of performing light work was based on the evidence available in the record at that time, which did not reveal any narrowing of the spinal canal. Thus, considering this new evidence, it cannot be said that Dr. Alex's opinion is supported by the medical evidence. Further, as plaintiff points out, Dr. Alex testified that plaintiff's medications would cause drowsiness and that the record revealed a diagnosis of migraines. The ALJ did not include any limitations resulting from the side effects of plaintiff's medications or plaintiff's migraines.

In addition, plaintiff's treating physician at Advanced Pain Center, Dr. Ninichuck, completed a Physical Residual Functional Capacity Questionnaire on March 25, 2011, in which he

expressed the opinion that plaintiff was incapable of even "low stress" jobs.  (Tr. 365).  Dr. Ninichuck found the following physical limitations:   able to walk fifty feet; sit for fifteen minutes at a time and sit a total of less than two hours; stand for ten minutes at a time and stand a total of less than two hours; must use a cane when engaging in occasional standing/walking; can never lift or carry even less than ten pounds; can occasionally turn head right or left and hold head in a static position; can rarely look up or down; can rarely stoop; can never twist, crouch, or climb; and has significant limitations with reaching, handling or fingering.   (Tr. 365-67).

The ALJ assigned "minimal weight" to Dr. Ninichuck's opinion due to the "generally unremarkable nature of longitudinal findings," and Dr. Ninichuck's reliance on plaintiff's subjective complaints.   (Tr. 20).   Dr. Ninichuck indicated that plaintiff suffers from chronic low back pain as a result of degenerative disc disease; depression; migraines; fatigue; anxiety; and insomnia.   (Tr. 364).   The records from Advanced Pain Center reveal that plaintiff sought regular treatment for her back pain with radiation to the lower extremities.   On examination, it was consistently noted that plaintiff had tenderness in the lumbar spine, limitation of range of motion of the spine, walked with a cane, and had an antalgic gait.   (Tr. 424, 420, 412, 405, 385, 380, 374).   Muscle spasm was also noted on multiple occasions.   (Tr. 420, 385, 380, 374).   In addition, plaintiff had a positive straight leg raising test in February and March of 2011.   (Tr. 385, 380).   Plaintiff underwent multiple epidural steroid injections and was prescribed narcotic pain medication.   (Tr. 417, 410, 398).   The medical records from Advanced Pain Center support the presence of significant limitations due to plaintiff's back and other impairments. Although the ALJ concluded that the record did not reveal any remarkable objective findings, the findings of an antalgic gait, muscle spasm, and positive straight leg raising lend support to plaintiff's subjective complaints of pain.

With regard to the other medical evidence in the record, the ALJ pointed out that consultative examiner Dr. Enkvetchakul's findings on examination were unremarkable and he noted evidence of symptom magnification. (Tr. 18, 333). Dr. Enkvetchakul found no objective evidence that would require any type of work limitations. (Tr. 334). While Dr. Enkvetchakul's findings are inconsistent with plaintiff's claims of disabling pain, it is significant that Dr. Enkvetchakul examined plaintiff on only one occasion, on May 11, 2010. Plaintiff received a significant amount of treatment for her back pain at Advanced Pain Center in the one-year period following her consultation with Dr. Enkvetchaukul. Notably, objective findings of positive straight leg raising and muscle spasm were noted subsequent to Dr. Enkvetchakul's examination. In addition, plaintiff underwent the MRI of her lumbar spine in June 2011, which revealed narrowing of the spinal canal. For these reasons, the opinions of Enkvetchakul are entitled to little weight.

Plaintiff also argues that the ALJ erred in failing to consider plaintiff's mental impairment. Plaintiff notes that Dr. Alex testified that plaintiff was in need of mental health treatment. Plaintiff contends that subsequent to the hearing, plaintiff sought mental health treatment and was diagnosed with major depressive disorder. The fact that plaintiff was diagnosed with major depressive disorder after the ALJ's decision, however, is not relevant to the instant claim. The ALJ acknowledged that plaintiff had been diagnosed with both anxiety and depression by Dr. Ninichuck, but found that plaintiff had no limitations as a result of a mental impairment. (Tr. 18-19). The ALJ noted that these diagnoses appeared to be based on plaintiff's reported symptomatology as mental status findings consistently noted a normal mood and affect. (Tr. 19, 314-16). The ALJ also pointed out that providers at Advanced Pain Center routinely found that plaintiff's judgment and insight, memory, mood, and affect, language

29

functioning, fund of knowledge, and capacity for sustained mental activity were normal. (Tr. 19). In addition, the state agency psychologist, Dr. Toll, expressed the opinion that plaintiff's depression was not severe. (Tr. 336). Thus, the ALJ's finding that plaintiff had no mental limitations during the relevant period is supported by substantial evidence.

## Conclusion

In sum, the RFC formulated by the ALJ is not supported by substantial evidence on the record as a whole. The ALJ relied on the opinion of Dr. Alex in determining plaintiff's RFC, yet Dr. Alex did not have the benefit of plaintiff's most recent MRI, which revealed narrowing of the spinal canal. Dr. Alex testified that evidence of narrowing would affect his opinion regarding the credibility of plaintiff's subjective complaints of pain. The ALJ also failed to include limitations resulting from plaintiff's medications and migraines, which is inconsistent with Dr. Alex's testimony. In addition, plaintiff's treating physician, Dr. Ninichuck testified that plaintiff had disabling limitations as a result of her impairments. Even if Dr. Ninichuck's opinion is partially discredited, substantial evidence does not support the ALJ's finding that plaintiff retains the ability to perform the full range of light work. Because the RFC formulated by the ALJ was flawed, the ALJ's determination that plaintiff was capable of performing other work in the national economy was also erroneous.

For these reasons, this cause will be reversed and remanded to the ALJ in order for the ALJ to consider the relevant new evidence; formulate a new residual functional capacity for plaintiff based on the medical evidence in the record, and further develop the medical record if necessary; and then to continue with the next steps of the sequential evaluation process. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance

with this Memorandum.

Dated this 20th day of June, 2014.

_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE